Benjemen Sire, Respondent, v. J. Wesley Rosenquest and Emeline Colville, Appellants.

*Action for rent — proof that the plaintiff's grantor had applied in payment of the rent a deposit intended only to be used to pay the last year's rent.*

In an action brought to recover for rent due upon a lease, the property covered by which had been conveyed to the plaintiff by the original lessor, and under which lease a deposit has been made to secure the rent accruing during the last year of the term, the court considered what evidence was sufficient to show that such deposit, previous to the assignment and prior to the last year of the term of the lease, had been by the original lessor applied to the payment of rent already falling due thereunder.

Ingraham, J., dissented.

APPEAL by the defendants, J. Wesley Rosenquest and another, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 17th day of June, 1897, upon the verdict of a jury, and also from an order entered in said clerk's office on the 16th day of June, 1897, denying the defendants' motion for a new trial made upon the minutes.

*Henry Thompson*, for the appellants.

*Albert I. Sire*, for the respondent.

RUMSEY, J.:

The plaintiff was the grantee of the Bijou Theatre, situated on Broadway in the city of New York. His remote grantor was Edward F. James, who, while he owned the property, had leased it to Miles & Barton for a term of years at a yearly rent of $27,000, payable in monthly installments of $2,250 each. It was recited in the lease between James and his lessees that James had in his possession the sum of $6,000 belonging to Miles & Barton, which he owed them then, and that this sum he was to hold as security for the payment of the rents, provided that Miles & Barton were to receive interest on it at the rate of six per cent per annum, and the $6,000 with interest was to be repaid to them by application of it upon account of the rent accruing during the last year of the term. An interest in this lease was assigned by Miles & Barton to Henry E. Dixey, and subsequently the three persons then owning it assigned it to the defendants here who attorned to Sire, the plaintiff. This action was brought for the recovery of the installments which fell due on the 1st of April and the 1st of May, 1895. Soon after the last of these installments fell due, the defendants were dispossessed and the lease terminated. The defendants answered, setting up, among other things, the deposit of this sum of $6,000 with James by Miles & Barton; that that sum was properly applicable upon the installments of rent sued for, and asking, as an offset, that it be so applied, and that they have an affirmative judgment for the difference between the amounts due upon the rent and the $6,000, with interest. To this counterclaim the plaintiff replied, alleging that, before the time the plaintiff became the owner of the premises

described in the complaint, the former owner, Edward F. James, made an application of the $6,000 deposited with him in payment of the rents which were due and unpaid by the original lessees of the premises and the assignors of the defendants, so that no money remained on deposit in the hands of James not applied to the payment of the rent when the plaintiff became the owner of the premises. Upon the issues thus framed the parties came to trial. There was no dispute that the two months' rent sued for was unpaid, and it was practically conceded that James had in his hands at the time of the making of the original lease the sum of $6,000, which he agreed to hold and apply upon the rents at the last year of the term. But the plaintiff undertook to prove that this money was actually applied by James by an agreement between himself and Miles & Barton at the time when they were the sole lessees. For that purpose the plaintiff put James upon the stand, but it was at once made to appear that Miles & Barton were dead, and, therefore, the testimony of James was excluded, because he was incompetent to testify to a personal transaction with Miles & Barton. It did appear, however, that he had some conversation with Miles & Barton, at which Dixey was present, in regard to this money, and thereupon Dixey was put upon the stand. To understand the weight to be given to his testimony it is necessary to bear in mind that the plaintiff was endeavoring to prove the actual application by James of this $6,000, or some portion of it, upon the rents which had accrued from Miles & Barton while they were the lessees and he was the owner. He did not allege that such application was made in any particular way, nor was he bound to prove anything more than that there was an actual application.

Mr. Dixey testified that after he had become the owner of an interest in the lease with Miles & Barton, he met James, who presented to him a note for $4,000 made by Miles & Barton, and asked him to indorse it. Being naturally surprised at this request he declined to do so until he had seen Miles & Barton on the subject. Thereupon he and James went to the office of Miles & Barton and found them there, and thereupon ensued, between James and them, a conversation in which this $4,000 note was spoken about, and Miles & Barton were asked what it was made for. This question was asked of Dixey: " Do you remember what was said in reference to the deposit as to

what disposition, if any, had been made by them of the $6,000 deposited? Ans. That is what I understood; as I said before, it was counted on the rent. * * * Q. Was it also stated that they owed him money in addition to the $4,000 note? A. I cannot remember. Q. What was counted on the rent? A. The $4,000 note. They gave this note to Mr. James because they had used up what I understood them to say, the $6,000. Q. Because they had used up the $6,000? A. Yes, sir. Q. * * * Did they say anything about using up the $6,000? A. No, they said it was for rent; I understood it was for that. * * * Q. Did they say anything about the $6,000 deposit? A. Yes, they referred to it. Q. What did they, say referring to it? A. They said they had used it up for rent and gave him the notes. Q. Then they did say that they had used up the $6,000 for rent? A. Well, I don't know whether they used the $6,000, but they must have used up $4,000 of it. That is the reason I asked them why they should give him the $4,000. Q. They had used four of the six thousand dollars? A. Well, what I said was that they used this $4,000 for rent. Probably that went on the $6,000."

Then the question was asked: "Give us, as near as you can recollect, the substance of what they said about the deposit in his hands? * * * A. What was said was that there was $6,000 on deposit, but they had used this $6,000, or a portion of it — I don't know how much — for back rent, and when this note came up they said they would look out for that because it was a portion of the $6,000. That is as clear as I can give it. Q. This note was a portion of the $6,000? A. Yes, they said they would let it go on that."

There was further evidence, but unimportant, given on that subject. The only other fact material to it was that James had the $4,000 note still in his possession, which, if it had been received by him to make good the amount of $4,000 allowed upon the rent, so that he would still have $6,000 in his hands applicable to the rent, was not at all inconsistent with the claim of the plaintiff or with the story of Dixey.

The single question presented in the case is whether, upon that testimony, uncontradicted and undisputed as it was, the jury had a right to find, as they did find, that the $4,000 of this $6,000 deposit had been applied upon that rent. In considering this question the

limitations of our right to examine it must be borne in mind. An appellate court is not at liberty to set aside a verdict because it is not one which the court itself would have returned upon the evidence. The fact that the court is not satisfied with the verdict is of little importance, especially if the court below has refused to set it aside. No court has the right to interfere with a verdict based upon evidence, unless it is so manifestly against the weight of the testimony that it is clear that the verdict must have been the result of passion, prejudice, partiality or corruption. That there was evidence to warrant the finding of the jury, the quotations given above show clearly. There was no dispute as to the making of these admissions, and the simple question is whether the jury had the right to give to these admissions the meaning which they did give to them.

The statement of Dixey referred to a conversation had between the parties interested in the transaction, which constituted an admission on the one hand by the only parties who were entitled to be heard in regard to the matter that a portion of the $6,000 deposit had been applied upon the rent, and a concession of that fact by the party who was alleged to have made the application. While the testimony was confused and was not clearly given, yet the meaning of it was purely a question for the jury. Evidence even of an admission is not to be thrown aside and rejected because the court is not satisfied with the way in which it is given or because it is difficult to understand. The effect of these things upon it is a matter for the jury, and it would be an usurpation of power by an appellate court when testimony of an admission is given by an apparently disinterested and honest witness, and the jury had believed it, in the absence of anything to the contrary, to refuse to permit a verdict based upon that testimony to stand because they did not believe it, although the court below was satisfied with the verdict. The judge presiding at the trial heard this testimony ; he heard the emphasis and expression of the witness, and he understood better than we can what weight was proper to be given to these admissions. With the evidence fresh in his mind he expressed himself satisfied with it by refusing to set aside the verdict. No reason has been shown why this court should not follow the conclusion which it has reached.

No other question of importance is presented in the case, and no reason is shown why the judgment and order should not be affirmed, and they must accordingly be affirmed, with costs.

Van Brunt, P. J., Patterson and McLaughlin, JJ., concurred ; Ingraham, J., dissented.

Ingraham, J. (dissenting) :

I cannot concur with Mr. Justice Rumsey. The reply to the defendants' counterclaim alleged that, prior to the time when the plaintiff became the owner of the premises, the former owner thereof, to wit, Edward F. James, made an application of the amount of money deposited with him under the terms of the original lease, to wit, $6,000 and interest, in payment of the rents which were due and unpaid to him by the original lessees of the premises and the assignors of these defendants, so that no money remained on deposit or within the hands of the said original owner, Edward F. James, as security and unapplied in the payment of rent at the time when the plaintiff became the owner of the premises. Upon the trial the amount of rent for the two months sued on was admitted, and it was conceded that the defendants had not paid it. The plaintiff then attempted to prove by the original lessor the application of this $6,000 to rent, but that testimony was objected to on the ground that the lessees with whom it was claimed the transaction took place were both dead and that the evidence was incompetent under section 829 of the Code of Civil Procedure. That objection was sustained. The defendant then called Henry E. Dixey, who had subsequently become the partner of the lessees and to whom an interest in this lease had been assigned. He testified that he was present at an interview between James, the original lessor, and Miles & Barton, the original lessees; that this interview took place after he had acquired an interest in the lease ; that it was caused because of a request of James to Dixey to indorse some notes held by James made by Miles & Barton; that Dixey asked Miles & Barton whether he (Dixey) should indorse these notes held by James, "or why they should present it to me," and Miles & Barton said, "It is nothing to you; it is our business; we will take care of it." They said that this $4,000 note was for rent before Dixey became interested in the lease. Dixey was asked

whether they said anything about the $6,000 deposited, to which Dixey replied : " They said they had used it up for rent and gave him the notes." Upon being further asked, he testified : " Well, I don't know whether they used the six thousand dollars, but they must have used up four thousand of it ; that is the reason I asked them why they should give him the four thousand dollars." The witness further testified : " What was said was that there was six thousand dollars on deposit, but they had used this six thousand dollars, or a portion of it. I don't know how much for back rent, and when this note came up they said they would look out for that because it was a portion of the six thousand dollars. That is as clear as I can give it." It seems to me that this testimony was insufficient to sustain a finding that there was any agreement between James and Miles & Barton that the $6,000 which James held in his hands under this covenant in the lease should be applied to the payment of this rent which had been due prior to the time that Dixey acquired an interest in the lease and which was represented by the $4,000 note. The fact that Miles & Barton made a note for this sum of $4,000, by which they promised to pay that amount to James and which James requested Dixey to indorse, contradicted any inference that there was an agreement between Miles & Barton and James by which this amount of rent which was due and which was represented by the note, should be paid out of the $6,000 deposited in James' hands by Miles & Barton upon the execution of the lease. If the parties had agreed that $4,000 of this $6,000 so deposited should be used, the application of that sum would have paid the rent, and Miles & Barton would not have been responsible for it. The fact that Miles & Barton gave to James the note would show that they were still liable for the rent and that it had not been paid by the application of any portion of the $6,000. Under the terms of the lease this sum of money was to be held by the landlord as security for the payment of the rent, and such deposit, with interest, was to be repaid by the application thereof on account of the rent accruing during the last year of the said term. Any one purchasing this lease would be entitled to rely upon this covenant, that the sum of money was in the hands of the lessor, applicable to the payment of the last year's rent, in the absence of some express agreement by which this clause in the lease

was abrogated, so that the deposit should be applied, not to the payment of the last year's rent, but to the payment of the rent accruing at a previous period.

This testimony of Dixey's was, it seems to me, entirely insufficient to prove any such agreement. There was no admission that there had been any agreement between the landlord and the tenant by which the terms of the lease should be modified, and no such agreement was made in Dixey's presence. Dixey's understanding of what they meant after this lapse of time is hardly competent evidence of such an agreement; and, as before stated, the taking of a note of Miles & Barton's by James, the landlord, would be inconsistent with any agreement that the $6,000 on deposit had been applied to the payment of that back rent. The burden of proof was upon the plaintiff to show that this $6,000 had been applied in pursuance of an agreement between the landlord and tenant, modifying the lease in respect to the deposit and the application to be made of it, and I cannot find in Dixey's testimony any admission of such an agreement, or anything from which such an agreement might be inferred. All that is said is that the $4,000 note was a matter that affected Miles & Barton, and not Dixey, and that they (Miles & Barton) would take care of it. Dixey also testified, in a rather incoherent way, to some other reference to the $6,000, which he first said had been used up, and he subsequently said, as he understood it, that they had used up this $4,000 for rent; Dixey then stated, probably giving his own conclusion, that that was the $4,000 which went on the $6,000. James at that time said that he wanted the $4,000, or wanted Dixey's indorsement upon the note of $4,000. James did not say anything about the $6,000 in his hands; and, finally, when the court asked the witness to give the substance of what was said about the deposit, Dixey said : " What was said was that there was six thousand dollars on deposit, but they had used this six thousand dollars, or a portion of it, I don't know how much, for back rent; and when this note came up they said they would look out for that, because it was a portion of the six thousand dollars. That is as clear as I can give it." This does not seem to me to be any evidence that there was any agreement between James and Miles & Barton that the amount of this note was to be paid out of the $6,000 held on deposit by James, but, on the contrary, it would

appear that James insisted upon either the payment of the $4,000 or the indorsement of the note by Dixey, so that he would become liable upon it; thus negativing the claim that he had agreed that this rent, represented by the $4,000, was to be paid by an application of the $6,000 on deposit in his hands.

Judgment and order affirmed, with costs.